IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAZMINE FENTON,<br><br>                Plaintiff,<br><br>    v.<br><br>PORTILLO'S HOT DOGS, INC.,<br><br>                Defendant. | Case No. 07 C 1686<br><br>Hon. Harry D. Leinenweber |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jazmine Fenton (hereinafter, "Fenton") brings this action against Defendant Portillo's Hot Dogs, Inc. (hereinafter, "Portillo's") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq*. In her Complaint, Fenton seeks to hold Portillo's liable for harassment and constructive discharge, in violation of 42 U.S.C. 2000e *et seq.*, alleging that she reported sexual harassment by her supervisor, and Portillo's failed respond promptly and appropriately. Compl. ¶ 4. For the following reasons, Portillo's Motion for Summary Judgment is **GRANTED**.

### I. FACTS

#### A. Fenton's Employment at Portillo's

Portillo's operates restaurants in the Chicago area. Def.'s Statement of Facts ("Def.'s SOF") ¶ 2. From May 22, 2006 to September 11, 2006 (hereinafter, all dates are 2006), Fenton was employed by Portillo's as a part time crew member at the Crestwood

location. *Id.* at ¶¶ 13-14. Fenton's supervisors included co-managers Dominique Rutledge ("Rutledge") and Terance Murphy ("Murphy"). *Id.* at ¶ 15. During this time, Fenton was sixteen years old and a high school student. Pl.'s Statement of Facts ("Pl.'s SOF") ¶ 1.

Fenton alleges that, during her employment at Portillo's, Murphy repeatedly sexually harassed her, including, but not limited to engaging in the following incidents, which are undisputed by Portillo's for purposes of summary judgment. Def.'s LR56.1 Statement Ex. ("Def.'s Ex.") I. On multiple occasions, Murphy brushed his private parts against Fenton's rear. One time, he touched her lips, asked for a kiss, and told her that she was "sexy." On or about July 15, 2006, Murphy reached into Fenton's pocket and rubbed the top of her vagina through her clothes for five to ten seconds.

### B. Portillo's Policies and Training Regarding Harassment

Portillo's written policy on sexual harassment, included in the Employee Start-Up Guide given to each new employee, defines sexual harassment, lists examples of prohibited conduct, and provides a variety of reporting options. Def.'s Supp. Ex. 2. at 15-16. The Guide instructs an employee who feels like he or she has been subjected to unlawful discrimination to "contact [the employee's] General Manager, Area Supervisor, or the Human Resources Department," and it states that Portillo's will "not

retaliate against [the employee] for filing a complaint." *Id*. The Guide also includes the phone number of a direct line to the corporate office, which employees are instructed to use if they have questions about company policies or about harassment. *Id.* at 10.

Portillo's employees are required to participate in an orientation, in which a supervisor discusses the sexual harassment policy, and to acknowledge receipt and understanding of the policy. Def.'s SOF ¶¶ 3-5. Managers are given additional training regarding the prevention and correction of harassment. *Id.* at ¶¶ 7-10. When an employee reports harassment, company policy advises that a human resources representative or store manager take a written statement, investigate the allegations, determine whether the complaint has merit, and consider appropriate corrective action. *Id.* at ¶¶ 11-12. At the time of her hire, Fenton received a copy of the Employee Start-Up Guide, participated in the orientation, and acknowledged her understanding of the policy. *Id.* at ¶¶ 16-18; Def.'s Ex. H.

### C. Fenton's Complaints and Portillo's Investigation

On August 24, about six weeks after the incident in which Murphy put his hand in her pocket, Fenton reported most of Murphy's misconduct to Rutledge. Def.'s SOF ¶¶ 21-23. Fenton explains that she did not report the incidents immediately because she was intimidated by Murphy, who is over six feet tall and weighs about

300 pounds.  Fenton Dep. at 40-51; Pl.'s SOF ¶¶ 8-9.  After listening to her allegations, Rutledge requested that Fenton bring her parents to work the next day to meet with him, and he called his supervisor as well as Portillo's Director of Training and Human Resources, Sharon Maloney ("Maloney") to inform both individuals about his discussion with Fenton.  Def.'s SOF at ¶¶ 24-27.

On August 25, Rutledge, Fenton, and Fenton's parents met and discussed Fenton's allegations.  *Id.* at ¶¶ 28-34.  At Rutledge's request, Fenton listed and described the incidents on an Employee Reporting Form.  *Id.*; Def.'s Ex. I.  On this Form, Fenton listed the incidents she described to Rutledge the day earlier as well as the incident in which Murphy put his hand in her pocket.  *Id.*  During their discussion, Rutledge assured Fenton and her parents that he would investigate the allegations.  Def.'s SOF ¶ 34.

After the meeting with Fenton and before her next shift, Rutledge changed Fenton's work area so that she would have little or no contact with Murphy.  *Id.* at ¶¶ 35-38.  For the rest of Fenton's tenure at Portillo's, Fenton and Murphy were assigned to different zones of the restaurant and did not work directly with one another.  *Id.*  The two came into incidental contact a few times per week, however, and Fenton claims that Murphy continued to bump into her shoulder in a crowd of employees and "frown" at her.  *Id.*; Fenton Dep. at 97-106.  Fenton also alleges that Murphy effectively

reduced her biweekly hours from 66 hours to 56 hours. Fenton Dep. at 97-106; Pl.'s SOF ¶ 23.

After the meeting on August 25, Rutledge called Maloney and faxed her Fenton's written statement. Def.'s SOF ¶¶ 39-40. The next day, Rutledge interviewed and took statements from three other female employees with whom Fenton had discussed Murphy's conduct. *Id.* at ¶¶ 41-44. None of these employees had seen or heard Murphy sexually harass Fenton, but each claimed that Murphy behaved inappropriately toward herself. *Id.;* Def.'s Ex. L. The same day, Rutledge informed Murphy of the allegations by all four employees and took a written statement from him. Def.'s SOF ¶¶ 45-48. Murphy denied some of the accusations and gave innocuous explanations for others. *Id.* Rutledge instructed Murphy to have no contact with Fenton. *Id.*

On August 27 or 28, Maloney arranged to meet Fenton and her mother, Elease Johnson ("Johnson"), on September 1 at IHOP, a restaurant near Portillo's Crestwood store. *Id*. at ¶¶ 49-50. This meeting was rescheduled for September 8 due to a death in Maloney's family. *Id.* On September 8, Johnson called Rutledge, informed him that Fenton was resigning, and cancelled that day's meeting with Maloney. *Id.* at ¶ 51. Fenton explains that she resigned because she was afraid of Murphy, because her working hours had been reduced, because of Portillo's delay in responding to her complaint, and because she was suspicious of Maloney's arranging

their meeting at IHOP, rather than at Portillo's. Pl.'s SOF ¶¶ 24-25, 31; Fenton Dep. at 97-106, 166-167. Upon learning of Fenton's resignation, Maloney called Johnson, promised that Fenton would be protected from harassment or retaliation, and encouraged Fenton to return to work. Maloney said that she wanted to obtain more information from Fenton to complete her investigation. Def.'s SOF ¶¶ 54-55. Johnson told Maloney that Fenton would not meet with Maloney. *Id.*

On September 8, Maloney interviewed Murphy about the allegations against him by Fenton and the three other employees. *Id.* at ¶¶ 56-61. Murphy admitted to saying that another employee (not Fenton) had a "big booty" and denied other allegations. *Id.* The next day, Maloney suspended Murphy after interviewing the three other employees about their personal experiences. *Id.* Maloney then reviewed Murphy's file and found a written warning given two years earlier at another store after complaints that Murphy made sexual comments about an employee. *Id.*; *see also* Def.'s Ex. T. Based on Murphy's admission about the "big booty" comment and the prior warning, Maloney terminated Murphy on September 11. *Id.*

After Murphy's termination, Rutledge called Fenton, informed her that Murphy was fired, and encouraged her to return to work. *Id.* at ¶ 62. In addition, Maloney sent a letter to Fenton encouraging her to return to work and explaining that although she was unable to confirm Fenton's allegations, Murphy had been

terminated for misconduct toward other employees. *Id.*; Def.'s Ex. P. Fenton did not return to Portillo's to work. *Id.*

## II. STANDARD OF REVIEW

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if it could affect the outcome of the suit under the governing law, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view all the evidence and any reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir., 2000). The adverse party, however, may not rest upon the mere allegations or denials in the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." FED. R. CIV. P. 56(e).

**III. <u>DISCUSSION</u>**

The question for present purposes is not whether Fenton was sexually harassed by her supervisor, Terance Murphy, but whether Portillo's is vicariously liable for Murphy's actions.

**A. Sexual Harassment Under Title VII**

Title VII prohibits any workplace discrimination with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. 2000e-2(a)(1). When a supervisor harasses an employee, the employer may be vicariously liable to the employee subject to any affirmative defenses that may preclude liability. *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir., 2004). If the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment, the employer is strictly liable for the harassment. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765 (1998). When no tangible employment action is taken, however, an employer may raise an affirmative defense, namely, (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided or to avoid harm. *Id.*

### B. Constructive Discharge

Fenton asserts an independent claim for constructive discharge, and she argues that her constructive discharge prevents Portillo's from asserting the *Ellerth* defense with respect to her claim for harassment.

In order for the *Ellerth* defense to be available, the employer must not have taken a tangible employment action against the victimized employee. *Id.* An employee's constructive discharge may constitute a tangible employment action. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 140-41 (2004). In general, an employee is expected to remain employed while seeking redress so that the employer can address and remedy the situation, thus courts have set a high bar for constructive discharge claims. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789-90 (7th Cir., 2007). To establish a claim for constructive discharge, a plaintiff must prove that unlawful discrimination made his or her working conditions "so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Suders*, 542 U.S. at 141; *Boumehdi*, 489 F.3d at 789.

In a similar case, the Seventh Circuit held that an employee was not constructively discharged when she resigned after the harassment had stopped and she rebuffed the employer's invitation to return to work after the harasser had resigned. *McPherson*, 379 F.3d at 440. Likewise, an employee who resigned before the employer

"had a chance to complete its investigation" of the harassment was not constructively discharged. *Cooper-Schut v. Visteon Automotive Systems*, 361 F.3d 421, 429 (7th Cir., 2004).

The undisputed facts in this case establish that Fenton was not constructively discharged. Immediately after learning of Fenton's allegations, Rutledge and Maloney began addressing the situation. Fenton was repeatedly assured that she would suffer no retaliation and that a full investigation was underway. The schedule was adjusted so that Murphy and Fenton would not work together, and from then on, the two had little contact with one another. Fenton's unsupported contention that Murphy reduced her working hours is not enough to create the intolerable working conditions sufficient for a constructive discharge. Moreover, after Fenton resigned, Portillo's informed her that Murphy had been fired and attempted to convince her to return to work. At this point, absent evidence of intolerable working conditions or continuing harassment, it was unreasonable not to return to Portillo's. Thus, Fenton's decision to quit her job is neither a tangible employment action nor a separate basis for relief.

### C. The *Ellerth* Defense

#### 1. Defendant Employer's Duties

The first element of the *Ellerth* defense requires Portillo's to show by a preponderance of the evidence that it exercised reasonable care to prevent and promptly correct any sexually

harassing behavior. *Ellerth,* 524 U.S. at 765. Fenton argues that Portillo's written sexual harassment policy is unreasonable and inadequate because it fails to identify specific individuals that an employee can contact to report harassment, and it does not instruct teenage employees on what to do if a supervisor is the sexual harasser. In addition, Fenton contends that the company's response to her complaints was delayed and unreasonable because Portillo's allowed Murphy to continue to work as a supervisor after reports of harassment were made by multiple female employees. Portillo's responds that its harassment policy is comprehensive and that its efforts to address Fenton's complaints were immediate, thorough, and effective.

First, Portillo's has established that it exercised reasonable care in preventing sexual harassment. The Seventh Circuit has held that, while an employer is not required to tailor its complaint procedures to the competence of each individual employee, the employer's mechanism for responding to complaints must be reasonable based on the employment circumstances. *E.E.O.C. v. V & J Foods, Inc.*, 507 F.3d 575, 578 (7th Cir., 2007) (holding that a company knowingly employing many teenagers was obligated to design procedures to the understanding of the average teenager). The existence of "an effective antiharassment policy with complaint procedure" will often satisfy this prong. *Haugerud v. Amery School Dist.*, 259 F.3d 678, 698 (7th Cir., 2001).

This Court finds that, as a matter of law, Portillo's written policy and training are reasonable measures to prevent harassment. The policy explains sexual harassment and encourages employees to report any harassment to a store supervisor or to Human Resources. Employees are given an employee assistance phone number, which allows them to contact Portillo's corporate office directly with questions or reports of harassment. Fenton received a copy of this policy when she was hired, and she signed that she read and understood it. Considering Portillo's written policy, reporting procedures, and training, the Court concludes that Portillo's has established that it exercised reasonable care in preventing sexual harassment.

Second, Portillo's has demonstrated that, after Fenton reported harassment, it took "prompt and appropriate corrective action" that was "reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations [were] made." *Cerros v. Steel Technologies*, *Inc.*, 398 F.3d 944, 953-54 (7th Cir., 2005). Title VII does not "require success - it only requires that an employer act reasonably to prevent sexual harassment." *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 (7th Cir., 1999). Nor does the law mandate that an employer immediately suspend or terminate a harassing supervisor upon a report of harassment. *Mueller v. McGrath Lexus of Chicago*, No. 02 C 0021, 2003 WL 21688230, *8 (N.D.Ill., July 17, 2003).

Immediately after hearing Fenton's complaints, Rutledge arranged a follow-up meeting, reported to his supervisor and to the Human Resources Department, and reassigned Fenton to work in another area of the store to minimize interaction between her and Murphy. Over the following three weeks, Rutledge and Maloney took comprehensive measures to investigate allegations made by Fenton and the other female employees, including interviewing and taking written statements from each employee and Murphy, reviewing Murphy's personnel file, and, in the end, suspending and terminating Murphy. Notably, after Fenton's initial complaint, the harassment stopped, further evidencing the effectiveness of Portillo's response. *Mueller*, 2003 WL 21688230 at *9. Therefore, this Court finds that Portillo's has satisfied the first element of the *Ellerth* defense.

### *2. Plaintiff Employee's Duties*

Finally, the undisputed facts conclusively establish the second prong of the *Ellerth* defense, which requires Portillo's to demonstrate that Fenton "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765. According to the Seventh Circuit, an employee's reticence, or "unreasonable foot-dragging," may be sufficiently serious as to complete preclude an employer's liability. *Savino v. C.P. Hall Co.*, 199 F.3d 925, 935 (7th Cir., 1999). In this case, after Fenton reported Murphy's misconduct, Rutledge separated the two employees so that they would

not work together.  After substantiating other employees' complaints, Portillo's terminated Murphy.  Fenton's resignation before her meeting with Maloney, her unwillingness to participate in the investigation, and her refusal to return to work after Murphy's termination demonstrates that Portillo's has satisfied its burden under *Ellerth*.  *See, Hicks v. Speedway Superamerica, LLC*, No. 01-0702-C, 2003 U.S. Dist. Lexis 9438, *25-26 (N.D.Ill., May 21, 2003).

Given these facts, and the standard set out in *Ellerth*, this Court finds that this case involves no questions of material fact that precludes summary judgment.  Consequently, this Court grants summary judgment to Portillo's at this time.

### IV. <u>CONCLUSION</u>

For the reasons stated herein, Portillo's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** November 13, 2008